Withers, J.
delivered the opinion of the Court;
It is understood that on the circuit the jury examined the question between these parties with reference to no -other source or measure of their respective rights, except such as may be found m the Acts- of 1744 and 1786. Whatever may have been said at the bar on circuit, as to the rules of the common law as applicable to easements, that did not enter into the consideration of the jury, for the charge of the presiding Judge directed their attention only to the Act of 1786. We shall, therefore, investigate the question submitted to this Qourt with a view to ascertain whether any mistake was committed in the investigation of the statutory regulations respecting rice dams and banks.
Though the Act of 1744 is not noticed by Judge Brevard in his digest, yet it is still of force so far as it may not be superseded by the provisions of the Act of 1786. That of 1744 was regularly renewed, from time to time, till 1783, when it was made perpetual, until repealed, amended or otherwise altered.
Undoubtedly the same general objects or line of policy prevailed in both Acts; and in essential particulars, the latter is probably a substitute for the former. For forty two years the Act of 1744 had force and effect, and the scheme of it was as follows : No one should be permitted or allowed to make or keep any dams or banks, so as to stop the course of any waters, and thereby overflow another’s lands, without his previous consent; nor to let off any reserved water, so as to injure the crops upon the grounds of other persons, on pain of redress instanter, by having his dam cut, by authority of a magistrate, on survey and report by freeholders, in such manner as to prevent any further damage. The object of reimbursement was also looked to for damage already sustained, to be obtained by the action of a magistrate, if the surveyors reported the amount to be not exceeding four pounds; in a higher jurisdiction if the sum was ascertained to be greater.
Let us now look to the policy of the Act of 1786. There was wanting, says the preamble, “a proper law to ascertain, the time when the (dam) ought to be opened, which (it is further ádded,) “has been attended with many inconveniences, and oftentimes is the cause of much contention.” Two clauses are then enacted in relation to water kept during the winter, on grounds upon which rice shall be planted the *351 ensuing spring. It is thought probable that these sections relate to water which a rice planter may keep during the winter on his own planting lands; and the legislation concerning that case, if this idea be correct, has reference to interests of proprietors below him, since those above could hardly suffer an inconvenience by water kept by another below on his own lands. However that may be, the dam containing such water on such ground is, by the first clause, required to be cut so as to let it off, on or before the 10th day of March, in every year, on pain of a pecuniary forfeiture for every instance of neglect; and in the second clause, in case of neglect to let the water “off the grounds before described,” and in case of complaint by the party affected, or his representative, and in case freeholders sworn shall upon survey be of opinion that the obstructions do or may prevent the complainant from planting his rice in proper time, they oí-as majority of them may cause the same to be immediately opened or removed, in any way or manner deemed necessary to afford the most effectual relief; provided that no one shall be liable to the penalty prescribed, nor to have his banks opened, “who shall have made through his or her own lands a sufficient drain or drains (of which the said freeholders shall be the judges) to carry off the waters passing thrdugh the same, in as expeditious a manner as they could have passed through the natural course or channel, in case no such banks had been erected.” Then follows the third clause, which is supposed to embrace the case before us, and to be attended by the exemption contained in the proviso just cited. The structure of it is awkward and ungrammatical, though it is so printed in the authorized publication of the laws by Timothy in 1786. It is as follows : “That it shall be lawful for any person, at any time bettveen the said tenth day of March and the first day of November, in every year, to apply in manner aforesaid, for a warrant of survey on any obstructions which he or she may conceive to impede the conveying off any surplus water, on his or her rice grounds, and which by remaining thereon may prove any way injurious, or shall at any time hereafter make or keep up any dam or dams which shall stop the course of any water so as to overflow the lands of any other person or persons whatever, without the consent of such person or persons first had and obtained, and which shall be injurious to the said person or persons, then in either of such cases the magistrate and freeholders by him appointed, shall proceed in the same manner as directed in the foregoing clause.” &c.
It is supposed the evils in this third clause described are not the same specified in the first and referred to in the second, which was the keeping of water after the 10th of March by dams “on grounds on which rice shall be planted *352 in the spring^’ Then there were two descriptions of mischief intended to be remedied, for the language is, “in either of such cases.” Perhaps the idea was to cause the removal 0£ ttany obstruction,” as one case, and the cutting of a dam, as another, and that both had reference to overflowing land above, or rather the hindrance of the natural flow of surplus water from it. At any rate, this is the grievance complained of by the present plaintiff.
The answer made to his complaint was that although the defendant had arrested the natural flow of the water off the plaintiff’s lands above, and although the drain provided by him did not on the occasion complained of “carry off the waters in as expeditious a manner as they could have passed through the natural course or channel,” yet when the drain was originally made in 1787, perhaps it was adequate to that end, and if it had since become otherwise, by any means which were not traceable to the defendant, he was not liable. And the presiding Judge held this defence complete if proved; that is to say, it was -holdefl to be the duty of the plaintiff to keep open in all future time a drain adequate originally to the end contemplated by the Act of 1786.
We think there was error in this. Our opinion is that so long as the Act of 1786 is the rule of mutual right between the parties, it speaks the same language on the tenth day of March, in every year. No doubt as time advances after the old channel is closed, the application of that language may become more difflcult. Indeed it must be so. To illustrate: Suppose freeholders assembled for the survey in March, .1787; the condition of the mutual,channel would then have been well known — it could have been satisfactorily ascertained how expeditiously the water passed through it; and, therefore, whether the drain in its stead was equivalent. Suppose, however, the freeholders, assembled in 1842, (as it is understood they were, for defendant’s dam was then cut) the question for them would be, is the facility for the flow of water, by the artificial and substitued means, as great as the facility by the natural channel would now have been, “in case no such banks (to use the language of the Act) had ever been erected.” No doubt there may be difficulty in the problem,- as there generally is in all questions touching such matters, but not greater than many others, that juries have to encounter and solve. The obscurity around objects must increase as we recede from them by time ór space; and posi-bly it might be fair to suggest that a liberal construction of doubtful evidence should be accorded to th'e adversary of him whose instrumentality and convenience had been made to enervate it.
Many reasons might be assigned in support of the view we take, to wit: that an adequate artificial vent for the *353 water is t-o be furnished in each and every year by the party stopping it by a dam, adequate in the sense of the Act, as just interpreted, and at any time when the freeholders may be called. For example; the occasion requiring it is created by the said party for his convenience and interest, the Act contemplates one drain or more, and his convenience or interest might lead him to construct many, and in locations or under other circumstances such as might unduly burthen the other party to keep them open. If the right to divert the water from its original course, should be considered as an easement, (which however it would be strange to say one could acquire on his own land) then, at any rate, it would be an easement of the defendant’s, and he would, on general principles, be bound to keep it up. Surely it is no easement of Brisbane’s that O’Neall has changed the course of a stream running through the lands of both, nor could it ever do him any injury if the water be not thrown back upon him. If it should be considered the easement of Brisbane he might find some difficulty on general principles in keeping it in repair. He could not (according to the case of Capers v. McKee,) either take materials or dig the ground for the purpose oi keeping up his easement to an extent beyond that to which he had. been accustomed so to do, for a period and in the manner requisite to make this a part of the servitude. Suppose the action had been brought by Brisbane against O’Neall in 1788, and O’Neall had proved an adequale drain, •what should have hindered Brisbane from replying; “be it so, and though by the terms of the Act such a drain shall save your bank or dam from being cut, between the 10th day of March and the first of November, yet that Act nowhere exempts you from your common law liability for any injury your operations may have caused to me — -and although, if my object had been to plant my rice and make a crop, I should have resorted to the magistrate and freeholders for the summary means which the Act provides for that exigency, yet these means are placed in my hands for that exigency only, and whether I avail myself of that or not, I am not estopped to claim in an action on the case such damages as my proof will warrant.” It is not obvious what flaw there would have been in such reasoning. The remedy provided by the Act was designed, as its leading object, to enable every riparian proprietor to make a rice crop, and yet to permit the improvement or preparation of lands in winter. So far as the provisions of the Act go, the remedies therein provided can be applied only within a prescribed period, according to the third section (between March 10 and November 1.) Now at any other time of the year, (so far as this section is concerned,) the defendant in this cause might erect his dam as high as he pleases and stop up his drain, and the remedy *354 of the Act would be wholly inapplicable. In this state of things he might maintain his structures up to the very day, ’ the 10th of March, and what right- would the plaintiff have to go on his land and clear out the ditch ? Might not the defendant say, “on the 10th March, I will open my dam or the drain, or else the freeholders may cut the former, on your complaint. As to any damage you have sustained in the meantime, the Act says nothing about that; it is enough for its terms that I may have on the given day an open dam, or an adequate drain, and you may look to your common law remedy.” It is clear that the drain was to be provided as well with a view to the proprietor below as to him above. Which of them should be held to scour it ?
1 Strob. 164.
5 Stat. 356.
It never was intended that the system adopted by the Act should interfere at all with the rights of property of the parties as they existed at common law, because the remedies were enforcible only for a certain period of the year, were not suitable for the reimbursement of damages sustained, since the one was cutting the dam and the other was a forfeiture of 100 pounds, one half to the informer and the other to the poor; which leads to the idea of a public offence and punishment, and not a civil remedy to the individual; and by the Act of 1799, an explanation of the Act of 1786 was given, to the effect that notwithstanding the. system and speedy remedies of that Act, it was not to be construed to authorize any person to keep water at any time on another’s land. This shews that the inference of a conclusion, that because a specific prohibition so to keep water, and a remedy for its violation, is enacted for a certain portion of the year, the same may be done during.the remainder of the year, is excluded.
That this, however, may be done by consent, it did not need the language of the Act of 1786 to establish ; nor is there any doubt that a very long acquiescence might be given in evidence to authorize the presumption. We mean to prejudge no view of this case which may arise from presumption of a legal character, and sufficiently proved to the jury.
We decide only that where the defendant invokes protection from the Act of 1786, against the complaints of one who is allowed by that Act to complain, he invokes a dispensation from the liability to have his dam cut or to pay a penalty or to suffer both — and at the same time he must shew that he presents the only condition of such dispensation, to wit: “a sufficient drain or drains to carry off the waters passing through the same, in as expeditious a manner as they would have passed through the natural course or channel in case no such bank had been erected.” The motion for a new trial is granted.
Richardson, J. — Evans, J. — Wardlaw, J. — and Frost, J. — concurred.

Motion granted.